# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| NYDIA JENKINS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EQUIFAX, INC., and EQUIFAX INFORMATION SERVICES, LLC,<br>Defendants. | No.:  1:22-cv-03072-LMM-CCB<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Nydia Jenkins, individually and on behalf of the class defined below, brings this Amended Class Action Complaint ("Amended Complaint") against Equifax, Inc. and Equifax Information Services, LLC (collectively, "Equifax" or "Defendants"), and alleges as follows:

## NATURE OF THE CASE

1.      On August 2, 2022, Equifax confirmed that due to a "glitch" in its technology systems, the company provided inaccurate credit scores to lenders about potentially millions of individuals who applied for credit from mid-March through early April (hereinafter "the Glitch"). (*See "Equifax Sent Lenders Inaccurate Credit Scores on Millions of Customers"* article dated August 2, 2022, attached hereto as **Exhibit 1**).[1]

2.      Equifax is a consumer reporting agency, as defined by the Fair Credit Reporting Act, 16 U.S.C. § 1681, *et seq*. ("FCRA").[2]

3.      Consumer reporting agencies assemble and evaluate credit, public record, and other consumer information into consumer reports or "credit reports."[3]

4.      The FCRA was enacted ''to protect consumers from the transmission of inaccurate information about them and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner.''[4]

5.      Among other things, the FCRA "require[s] that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the

---

[1] Andrew Ackerman and AnnaMaria Andriotis, *Equifax Sent Lenders Inaccurate Credit Scores on Millions of Consumers*, Wall St. J. (Aug. 2, 2022, 3:11PM), *available at* https://www.wsj.com/articles/equifax-sent-lenders-inaccurate-credit-scores-on-millions-of-consumers-11659467483?st=l13znb3fsy0ik1n&reflink=desktopwebshare_permalink (hereinafter Exhibit 1).

[2] 15 U.S.C. §§ 1681-1681x.

[3] *See* 15 U.S.C. § 1681a(d) (defining "consumer report"); *see also* 15 § U.S.C. 1681 (recognizing "a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy").

[4] *Guimond v. Trans Union Credit Info.*, 45 F.3d 1329, 1333 (9th Cir.1995) (citations omitted); .

consumer, with regard to the confidentiality, ***accuracy***, relevancy, and proper utilization of such information." <u>15 U.S.C. § 1681(b)</u>.[5]

6.      The Consumer Financial Protection Bureau ("CFPB") has recently affirmed that,  when preparing consumer reports, consumer reporting agencies must comply with their FCRA obligation to "follow reasonable procedures to assure maximum possible accuracy" under section 607(b).[6]

7.      Equifax is allowed to perform credit reporting services, involving such sensitive consumer credit information, only if it adheres to the requirements of laws meant to protect the privacy and accuracy of such information, such as the FCRA.  Equifax's creation, use, and furnishing of consumer reports is and was intended to affect Plaintiff and other Class Members, and the harm caused by the inaccuracies on consumer reports resulting from the Glitch was entirely foreseeable to Equifax.

8.      The damages that Plaintiff and Class Members bear as a result of the Glitch cannot be rectified by merely updating the affected credit reports. In addition, while consumer reporting agencies offer consumers one free credit report per year, consumers who request more than one credit report per year from the same consumer reporting agency (such as Equifax) must pay a fee for the additional report. Such fees constitute out-of-pocket costs to Plaintiff and Class Members.

9.      Defendants' actions or inactions that allowed for the Glitch also violate their duties and obligations as a consumer reporting agency under the FCRA, as described in detail herein. Each instance in which Equifax has failed to comply with Section 607 of the FCRA constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

---

[5] *Id.* (emphasis added).

[6] Bureau of Consumer Fin. Prot., *Fair Credit Reporting; Name-Only Matching Procedures*, 86 FR 62468, 62472 (Nov. 10, 2021) (noting that "it is not a reasonable procedure to assure maximum possible accuracy" if a consumer reporting agency uses "insufficient identifiers to match information to the consumer who is the subject of the report.").

10.     Further, though the Glitch was caused by an employee or agent of Equifax's "coding issue," Equifax continued to provide inaccurate credit scores and consumer reports when Defendants knew or should have known that Plaintiff's and Class Members' consumer reports and credit scores were inaccurate. Thus, Equifax's acts described herein constitute a pattern or practice of willfully and recklessly failing to comply with the FCRA, as set forth in the FCRA, 15 U.S.C. § 1681n.

11.     This action seeks to hold Defendants accountable for their conduct and seeks vindication and recompense on behalf of the individual consumers who were harmed by Equifax's negligent and/or willful violations of the FCRA.

12.     Plaintiff seeks to recover FCRA actual, statutory, and punitive damages to the fullest extent allowable by law.

13.     Plaintiff and Class Members have standing to sue as a result of Equifax's violations of federal and state statutes, including the FCRA, as detailed herein. Further, because of Equifax's acts and/or omissions, willful disregard and conduct, and want of ordinary care, and the resulting harm from the Glitch, Plaintiff and Class Members have suffered actual injury have suffered (and will continue to suffer) economic damages and other injury and actual harm as described herein.

## PARTIES

### A.     Plaintiff

14.     Plaintiff Nydia Jenkins is and was a Florida citizen during the relevant class period and is a resident of Jacksonville, Florida. Plaintiff Jenkins applied for an auto-loan and was preapproved in January 2022. Though she had been pre-approved, Plaintiff Jenkins was denied by Arlington Toyota for her auto-loan in early April of 2022. In the letter she received regarding her denial, Plaintiff Jenkin's saw that her credit score, reportedly furnished by Equifax, was inaccurate by 130 points. In order to secure financing for a vehicle, Plaintiff was forced to apply for another loan from a "buy now" dealership and received a loan with much less favorable rates. When Plaintiff was

pre-approved for her loan in January of 2022, Plaintiff was to pay an estimated $350 per month. Under the terms of her current loan, Plaintiff pays $252 bi-weekly.

**B.    Defendants**

15.    Defendant Equifax, Inc. is incorporated in Georgia with its headquarters and principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309.  It is a citizen of Georgia.

16.    Defendant Equifax Information Services, LLC, is incorporated in Georgia with its headquarters and principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309.[7]  It is a citizen of Georgia. Defendant Equifax Information Services, LLC, is a wholly owned subsidiary of Defendant Equifax, Inc.[8]

17.    Equifax is one of the three major "credit bureaus" in the United States. As a consumer reporting agency, Equifax maintains information related to the credit history of consumers and provides the information to credit grantors who are considering a borrower's application for credit or who have extended credit to the borrower. As a consumer reporting agency, Equifax is engaged in a number of credit-related services, and supplied over 2.1 billion credit card files to lenders in 2021.[9]

<u>**JURISDICTION AND VENUE**</u>

18.    This Court has subject matter jurisdiction over this action under <u>28 U.S.C. § 1331</u> because it presents a federal question and arises from violations of the Fair Credit Reporting Act, <u>15 U.S.C. § 1681</u> *et seq.* Further, this Court has subject matter jurisdiction over this action under the Class Action Fairness Act, <u>28 U.S.C. § 1332(d)</u>, because this is a class action involving more than 100 Class Members, the amount in

---

[7]    Company  Profile,  *Equifax  Information  Services,  LLC,*  BLOOMBERG, <u>https://www.bloomberg.com/profile/company/0007367D:US</u> (last visited Aug. 5, 2022).

[8]Equifax, Inc., *List of Equifax Inc. Subsidiaries*, *available at* <u>https://investor.equifax.com/sec-filings/all-sec-filings/content/0001144204-12-010639/v244511_ex21-1.htm</u> (last visited Aug. 5, 2022); *see also* Equifax, Inc., *Registration Statement (Form S-4)*, filed with the Securities & Exchange Commission Dec.     3,     2006,     *available     at* <u>https://www.sec.gov/Archives/edgar/data/33185/000095014402012539/g79586sv4.htm</u> (last visited Aug. 5, 2022).

[9] *See Equifax Company Profile,* Equifax, <u>http://www.equifax.com/about-equifax/company-profile</u> (last visited Aug. 3, 2022).

controversy exceeds $5 million exclusive of interest and costs, and many Class Members are citizens of states different from Defendants.

19.     This Court has personal jurisdiction over Defendants because they maintain their principal place of business in Georgia, regularly conduct business in Georgia, and have sufficient minimum contacts in Georgia. Defendants intentionally avail themselves of this jurisdiction by conducting their corporate operations in Georgia.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Equifax is headquartered in this District, it regularly transacts business in this District, and a substantial part of the events, acts and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.     The Glitch Affected Millions of Consumers

21.     On May 27, 2022, reporting first emerged that Equifax, one of the country's three largest consumer credit reporting agencies, had provided inaccurate credit scores on millions of U.S. consumers seeking loans during a three-week period in 2022. (*See Equifax Telling Lenders of Potential Errors in Credit Scores,* article dated May 27, 2022, attached as **Exhibit 2**.).[10]

22.     According to public reporting in May of 2022, the Glitch occurred when Equifax experienced a "coding issue introduced during a technology change to its legacy online model platform may have resulted in the miscalculation of certain credit attributes for about 12% of credit scores."[11]

---

[10]    Steve Goode, *Equifax Telling Lenders of Potential Errors in Credit Scores,* NationalMortgageProfessional.com (May 27, 2022), *available at* https://nationalmortgageprofessional.com/news/equifax-telling-lenders-potential-errors-credit-scores (hereinafter Exhibit 2).
[11] Ex. 2.

23.     Equifax stated that the Glitch was a "mistake made by our technology team, in one of our legacy applications that resulted in some scores going out that had incorrect data in it."[12]

24.     According to reports from consumers and public reporting, Equifax sent the erroneous scores on people applying for auto loans, mortgages and credit cards to banks and nonbank lenders related to individuals applying for lines of credit.[13]

25.     The scores were sometimes off by 20 points or more in either direction, according to public reporting, "enough to alter the interest rates consumers were offered or to result in their applications being rejected altogether."[14]

26.     However, upon information and belief, some scores were inaccurate by as much as 130 points.

27.     According to public reporting, "[t]he inaccurate scores were sent from mid-March through early April." Despite the importance of accuracy in consumer credit reporting, Equifax only began disclosing the errors to lenders in May.[15]

28.     In a statement on May 27, 2022, Equifax officials acknowledged "there had been a coding issue within a program slated for replacement, and that it may have resulted in a potential miscalculation of certain attributes used in model calculations."

29.     Further, Equifax allegedly acknowledged in May 2022 to resellers and lenders that, for some transactions, certain attribute values — such as "number of inquiries within one month" or "age of oldest tradeline" — were potentially incorrect.[16]

30.     Despite that alleged private acknowledgment, Equifax publicly stated that "credit reports" were not affected. However, as discussed below, items included on credit reports, including the credit score itself, are vital aspects of a consumer report.

---

[12] Equifax, *Equifax Statement on Recent Coding Issue*, Equifax.com (Aug. 2, 2022), *available at* https://www.equifax.com/newsroom/all-news/-/story/equifax-statement-on-recent-coding-issue/.
[13] Ex. 2.
[14] Ex. 1.
[15] Ex. 1.
[16] Ex. 2.

31.    In May of 2022, Equifax said data quality and accuracy are at the heart of everything Equifax does and they "take this technology issue very seriously."[17]

32.    Mark Begor, Equifax, Inc.'s chief executive, publicly acknowledged the Glitch at a June investor conference, calling it a coding issue that affected "legacy applications that resulted in some scores going out that had incorrect data."[18] He then said the company had fixed the problem and takes issues with its data quality seriously.[19]

33.    Despite the fact that potentially millions of consumers had inaccurate information provided to lenders, "[t]he impact really is going to be quite small," Mr. Begor said, "not something that's meaningful to Equifax."[20]

34.    In a statement about the Glitch, Equifax said that "[t]he issue has been fixed, [. . .] we are accelerating the migration of this environment to the Equifax Cloud, which will provide additional controls and monitoring that will help to detect and prevent similar issues in the future."[21]

## B.    Equifax is Obligated to Ensure Maximum Possible Accuracy in Consumer Reports

35.    Equifax is one of the major credit reporting agencies in the United States, as defined in the FCRA. *See* 15 U.S.C. § 1681a(f).

36.    As a consumer reporting agency, Equifax generates and sells consumer reports or "credit reports" containing consumer information and details of a consumer's credit history to businesses and its recurring clients.

---

[17] Ex. 2.

[18] Ex. 1.

[19] Ex. 1.

[20] Ex. 2; *see also* Equifax, *Equifax Statement on Recent Coding Issue*, Equifax.com (Aug. 2, 2022), *available at* https://www.equifax.com/newsroom/all-news/-/story/equifax-statement-on-recent-coding-issue/. (adding that "[t]he reference made by Mark to the impact as 'quite small, not something meaningful to Equifax' is specifically related to the materiality of the issue to Equifax's overall financial profile in the context of a discussion with investors.").

[21] Equifax, *Equifax Statement on Recent Coding Issue*, Equifax.com (Aug. 2, 2022), *available at* https://www.equifax.com/newsroom/all-news/-/story/equifax-statement-on-recent-coding-issue/.

37.     Consumer reports are used by parties to determine whether and on what terms a consumer will be offered credit, including credit cards, student, car, and small business loans, mortgages, rental housing, and insurance.

38.     The FCRA defines consumer reports as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility" in lending decisions.[22]

39.     As described by Equifax, "[b]usinesses rely on us for consumer and business credit intelligence, credit portfolio management, fraud detection, decisioning technology, marketing tools, and human resources-related services.  We also offer products that enable individual consumers to manage their financial affairs and protect their identity."[23]

40.     Prior to the Glitch, Equifax promised its customers and everyone about whom it collects consumer data that it would deliver accurate information about consumers. For example, Equifax's privacy policy stated, in relevant part: "We have built our reputation on our commitment to deliver **reliable information to our customers (both businesses and consumers)** and to protect the privacy and confidentiality of personal information about consumers."[24]

41.     Because of the importance of consumer report accuracy to businesses and consumers, the structure of the FCRA creates interrelated legal standards and requirements to support the policy goal of accurate credit reporting.[25]

42.     Among these is the requirement that, when preparing a consumer report, consumer reporting agencies ''shall follow reasonable procedures to assure maximum

---

[22] *See* 15 U.S.C. § 1681(d).
[23] *Id.* at 12.
[24] http://www.equifax.com/privacy/ (last accessed Aug. 3, 2022).
[25] Bureau of Consumer Fin. Prot.,*Fair Credit Reporting; Name-Only Matching Procedures,* 86 FR 62468 (Nov. 10, 2021)*, available at* https://files.consumerfinance.gov/f/documents/cfpb_fair-credit-reporting_advisory-opinion_2022-07.pdf.

possible accuracy of the information concerning the individual about whom the report relates.''[26]

43.     Further, the FCRA places strict obligations on credit reporting agencies, such as Equifax, when it comes to maintaining the accuracy of consumer credit reports. According to the CFPB, "[a]ccuracy in consumer reports is of vital importance to the consumer reporting system, particularly as consumer reports play an increasingly important role in the lives of American consumers.[27]"

44.     Section 607(b) of the FCRA, 15 U.S.C. § 1681e(b), requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

45.     This includes maximum possible accuracy with respect to the information that is included on an individual's consumer report – including, but not limited to credit score itself. [28]

46.     The Bureau has recently affirmed that, "[i]n preparing consumer reports, it is not a reasonable procedure to assure maximum possible accuracy" if a consumer reporting agency uses "insufficient identifiers to match information to the consumer who is the subject of the report."[29]

47.     Equifax is allowed to perform credit reporting services, involving such sensitive consumer credit information, only if it adheres to the requirements of laws meant to protect the privacy and accuracy of such information, such as the FCRA.  Equifax's maintenance, use, and furnishing of consumer reports is and was intended to affect

---

[26] 15 U.S.C. § 1681e(b).
[27] Bureau of Consumer Fin. Prot., Fair Credit Reporting; Name-Only Matching Procedures, 86 FR 62468, 62468 (Nov. 10, 2021).
[28] Consumer Fin. Prot. Bur., *Fair Credit Reporting: Permissible Purposes for Furnishing and Using and Obtaining Consumer Reports,* 87 FR 41243 (Jul. 7, 2022), *available at* https://www.federalregister.gov/d/2022-14823/p-41.
[29] *Id.*

Plaintiff and other Class Members, and the harm caused by the inaccuracies on consumer reports resulting from the Glitch was entirely foreseeable to Equifax.

### C.   Impact of the Glitch

48.    Equifax acknowledges that, as a consumer reporting agency, it "impact[s] some of life's most pivotal moments."[30] Accordingly, the requirement of maximum possible accuracy in consumer reports "remains as important today as it was when the statute was enacted in 1970."[31]

49.    Indeed, according to the CFPB, "inaccurate information in consumer reports can have significant adverse impacts on consumers. These impacts are particularly concerning for prospective renters and job seekers struggling to recover from the impacts of the COVID–19 pandemic."[32]

50.    The CFPB recently raised concerns that "[c]onsumers with inaccurate information in their consumer reports may, for example, be denied credit or housing they would have otherwise received, or may be offered less attractive terms than they would have been offered if their information had been accurate."[33]

51.    These concerns were realized for the millions of individuals, including Plaintiff and Class Members, who were denied credit or housing that they would have otherwise received, or were offered less attractive terms than Plaintiff and Class Members would have received had their information been accurate.

52.    Initially, it appeared as if the Glitch was limited to individuals who applied for mortgages, and the "company said that less than 9% experienced a change of 10 points

---

[30] https://www.equifax.com/about-equifax/who-we-are/ (last visited Aug. 5, 2022).

[31] Bureau of Consumer Fin. Prot., *Fair Credit Reporting; Name-Only Matching Procedures,* 86 FR 62468, 62469 (Nov. 10, 2021)*, available at* https://files.consumerfinance.gov/f/documents/cfpb_fair-credit-reporting_advisory-opinion_2022-07.pdf.

[32] *Id*.

[33] Bureau of Consumer Fin. Prot., *Fair Credit Reporting; Name-Only Matching Procedures,* 86 FR 62468 (Nov. 10, 2021)*, available at* https://files.consumerfinance.gov/f/documents/cfpb_fair-credit-reporting_advisory-opinion_2022-07.pdf.

or less; less than 3% experienced a change of 11 to 20 points; and less than 1% experienced a change of more than 20 points."[34]

53.     However, further reporting in August revealed that the issue was not limited to individuals who applied for mortgages, and that the inaccurate consumer reports provided by Equifax "affected many lenders across multiple consumer loan products, not just mortgages, according to people familiar with the matter."[35]

54.     As reported by the Wall Street Journal in August of 2022,

> The percentage of incorrect scores provided to lenders varied, [people familiar with the matter] said. At one big bank, for example, 18% of applicants during the three-week period had incorrect scores, with an average swing of 8 points.
> [ . . .]
> Equifax told one large auto lender that about 10% of applicants during the three-week period had inaccurate scores, according to a person familiar with the matter. Of those, several thousand saw a change of 25 points or more on their credit score, the person said. In a small number of cases, applicants went from having no credit score at all to a score in the 700s—or vice versa, the person said. The most widely used credit scores range between 300 to 850; the higher the credit score, the more likely an applicant will get approved and at a lower interest rate.[36]

55.     Nearly 25 million credit reports were requested from the three major credit reporting agencies during the Glitch and thus it is likely that hundreds of thousands, if not millions, of consumers were harmed by Equifax's actions and inactions.

56.     As a result of the inaccurate reporting of their consumer credit information, Plaintiff and Class Members have experienced, without limitation, the following injuries:

- loss of use of and access to financial accounts and/or credit;

---

[34] Ex. 2.
[35] Ex. 1.
[36] Ex. 1.

- money and time expended to avail themselves of assets and/or credit frozen or flagged due to inaccuracies;

- impairment of their credit scores, ability to borrow, and/or ability to obtain credit;

- lowered credit scores resulting from credit inquiries following inaccurate reports being provided to lenders;

- costs and lost time obtaining credit reports in order to monitor their credit records to attempt to understand the reasoning behind the denials due to the Glitch;

- lost opportunity costs and loss of productivity from efforts to mitigate and address the adverse effects of the Glitch, including but not limited to efforts to research how to prevent, detect, contest, and recover from the Glitch;

- loss of the opportunity to control how their personal information is used; and

- continuing risks to their financial health, which remains subject to further harmful inaccurate reporting as long as Equifax fails to undertake appropriate, legally required steps to protect and ensure the maximum possible accuracy when creating consumer reports using the personal information in its possession.

57.    The damages that Plaintiff and Class Members bear as a result of the Glitch cannot be rectified by merely updating the affected credit reports. In addition, while credit reporting agencies offer consumers one free credit report per year, consumers who request more than one credit report per year from the same credit reporting agency (such as Equifax) must pay a fee for the additional report. Such fees constitute out-of-pocket costs to Plaintiff and Class Members.

58.    Defendants' actions or inactions that allowed for the Glitch also violate their duties and obligations as a consumer reporting agency under the FCRA, as described in detail herein. Each instance in which Defendants failed to comply with Section 607 of the

FCRA constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

59.     Further, though the Glitch was caused by an employee or agent of Equifax's "coding issue," Equifax continued to provide inaccurate credit scores and consumer reports when it knew or should have known that Plaintiff's and Class Member's consumer reports and credit scores were inaccurate.

60.     This action seeks to hold Defendants accountable for their conduct and seeks vindication and recompense on behalf of the individual consumers who were harmed by Equifax's negligent and/or willful violations of the FCRA.

61.     Plaintiff seeks to recover FCRA actual, statutory, and punitive damages to the fullest extent allowable by law.

62.     Plaintiff and Class Members have standing to sue as a result of Equifax's violations of federal and state statutes, including the FCRA, as detailed herein. Further, because of Equifax's acts and/or omissions, willful disregard and conduct, and want of ordinary care, and the resulting harm from the Glitch. Plaintiff and Class Members have suffered actual injury and have suffered (and will continue to suffer) economic damages and other injury and actual harm as described above.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff seeks relief on behalf of herself and all others similarly situated, brings all claims as class claims under Federal Rule of Civil Procedure 23(b)(1), (b)(2), (b)(3), and (c)(4). Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of a nationwide class defined as follows:

> **All individuals and entities in the United States whose credit score or consumer report was inaccurately reported or inaccurately provided to potential lenders as a result of "the Glitch" reported by Equifax to have occurred between at least March 17, 2022 through April 6, 2022 ("the Nationwide Class").**

64.     Except where otherwise noted, "Class Members" shall refer to members of the Nationwide Class.

65.     Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members and staff.

66.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

67.     The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

68.     **Ascertainability**: Membership of the Class is defined based on objective criteria and individual members will be identifiable from Equifax's records, including from Equifax's massive data storage, consumer accounts, and enterprise services.  Based on information readily accessible to it, Equifax can identify members of the Class who were victims of Equifax's Glitch and FCRA violations as alleged herein.

69.     **Numerosity**: The Class consists of hundreds of thousands, if not millions of individuals whose consumer reports were inaccurate as a result of Equifax's FCRA violations. Further, hundreds of thousands, if not millions of individuals experienced actual harm from Equifax's willful violations of FCRA in its refusal to remedy the Glitch. Accordingly, members of the Class are so numerous that joinder of all members is impracticable.  Class Members may be identified from Defendants' records, including from Equifax's consumer accounts and enterprise services.

70.     **Predominant Common Questions**: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely

individual members of the Classes.  Common questions for the Class include, but are not limited to, the following:

    a. Whether, during the class period, Equifax disclosed, or adequately disclosed, the Glitch to lenders or consumers;

    b. Whether Equifax used reasonable procedures to ensure that the information included on consumer credit reports was accurate;

    c. Whether Equifax's measures to ensure accurate consumer reports violate the FCRA;

    d. Whether Equifax's conduct violates the FCRA;

    e. Whether Equifax acted willfully, recklessly, or negligently when allowing the Glitch to continue without remedy;

    f. Whether Equifax has been unjustly enriched by its conduct; and

    g. Whether Plaintiff and Class Members have sustained damages as a result of Equifax's conduct and if so, what is the appropriate measure of damages or restitution.

71.     **Typicality**: Plaintiff's claims are typical of the claims of other Class Members, as all members of the Class were uniformly affected by Equifax's wrongful conduct in violation of law as complained of herein.

72.     **Adequacy of Representation**: Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel that is competent and experienced in class action litigation, including nationwide class actions and consumer protection litigation.  Plaintiff and their counsel have no interest that is in conflict with, or otherwise antagonistic to the interests of the other Class Members.  Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so.

73.     **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  This proposed class action presents fewer management difficulties than

individual litigation and provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single, able court. Furthermore, as the damages individual Class Members have suffered may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

**CAUSES OF ACTION**

**COUNT I**
**NEGLIGENT VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681, *et seq***
**(On Behalf of Plaintiff and the Nationwide Class)**

74.    Plaintiff hereby incorporates Paragraphs 1 through 73 as if fully stated herein.

75.    In enacting the FCRA, Congress made several findings, including that consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit information and other consumer information. 15 U.S.C. § 1681(a)(4).

76.    At all relevant times, Equifax acted as a consumer reporting agency as defined by the FCRA. Under 15 U.S.C. §1681a(f), a "consumer reporting agency" includes any person which, for monetary fees or on a cooperative nonprofit basis, regularly engages, in whole or in part, in the practice of assembling or evaluating consumer credit information or other consumer information for the purpose of furnishing "consumer reports" to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

77.    At all relevant times, Equifax had compiled and maintained a "consumer report" on Plaintiff and Class Members as defined by the FCRA. 15 U.S.C. § 1681a(d)(1). As defined in 15 U.S.C. § 1681a(d)(1), a "consumer report" is any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general

reputation, personal characteristics, or mode of living, which is used, expected to be used, or collected, in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for (i) credit or insurance to be used primarily for personal, family, or household purposes, (ii) employment purposes, or (iii) any other purpose authorized by 15 U.S.C. § 1681b."

78.     The FCRA's definition of consumer reports includes, without limitation, a consumer reporting agency's numerical credit score for an individual – which serves as a numerical representation of the agency's interpretation of an individual's overall creditworthiness. *See* 15 U.S.C. § 1681a(d)(1).

79.     As individuals, Plaintiff and Class Members are consumers entitled to the protections of the FCRA. 15 U.S.C. § 1681a(c).

80.     As a consumer reporting agency, Defendants were (and continue to be) required to identify, implement, maintain, and monitor the proper measures, policies, procedures, protocols, and software and hardware systems to safeguard, protect and ensure the accuracy of the consumer credit information in its possession, custody, and control, including Plaintiff's and Class Members' consumer reports and credit scores. *See* 15 U.S.C. 1681(b).

81.     As a consumer reporting agency, Defendants' actions or inactions that allowed for the Glitch violate its duties and obligations as a consumer reporting agency under the FCRA.

82.     Defendants' actions or inactions that allowed for inaccurate credit entries and or credit scores to be included on consumer reports also violate its duties and obligations as a credit reporting agency under the FCRA.

83.     As alleged herein, Defendants have engaged in a number of practices that, taken together, failed to use reasonable measures to provide for the maximum possible accuracy on consumer credit reports. Among other things, Defendants failed to:

    a.  Develop and disseminate comprehensive information integrity policies,

including those related to information verification related to the consumer reports and credit scores of Plaintiff and Class Members;

b. Assess the risks of using code that could and would lead to inaccurate credit scores and/or consumer reports being sent to lenders;

c. Take appropriate action to correct existing vulnerabilities or threats to personal information in light of known risks, especially those that lead to the Glitch;

d. Adequately train their employees on FCRA compliance; and/or

e. Develop and maintain a monitoring system in place to ensure their systems complied with the FCRA.

84. The lack of such reasonable measures to provide for the maximum possible accuracy on consumer credit reports directly caused damages to Plaintiff and Class Members, as detailed herein.

85. By the above-described wrongful actions, inaction, and omissions, want of ordinary care, and the resulting harm to Plaintiff and Class Members, Defendants negligently violated the FCRA, 15 U.S.C. § 1681, *et seq*.

86. Defendants have violated 15 U.S.C.A. § 1681e(b) because, due to the Glitch, Defendants failed to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

87. Defendants repeatedly created inaccurate consumer reports as a result of the Glitch, and Plaintiff and Class Members have suffered the harm as detailed herein.

88. Despite lacking sufficient testing procedures regarding the accuracy of the consumer reports and credit scores that would have prevented the Glitch, Defendants relied on these procedures, which were unreasonable, and thus Defendants had no reason to believe that all of the information it included in the consumer report accurately pertained to the consumer who is the subject of the user's request.

89. As a direct and proximate result of Equifax's actions and failures to act

described herein, Equifax offered, provided, and furnished Plaintiff's and Class Members' inaccurate consumer reports. In each instance, Equifax was in violation of, Section 1681e of the FCRA.

90.     Equifax's negligent failure to use reasonable information verification procedures resulted in a yet unknown number of inaccuracies on consumer reports created by Equifax, in violation of § 1681e(b).

91.     Under Section 1681 of the FCRA, Equifax is liable to Plaintiff and Class Members. Equifax therefore is liable to Plaintiff and Class Members for their actual damages as a result of Equifax's failure to comply with the FCRA, as well as costs and reasonable attorneys' fees, in amounts to be proven at trial. 15 U.S.C. § 1681o.

92.     As a result of the conduct, action and inaction of Equifax, Plaintiff suffered damage by loss of credit, loss of ability to purchase and benefit from credit, a chilling effect on future applications for credit, and the mental and emotional pain, anguish, humiliation and embarrassment of credit denial.

## COUNT II
## WILLFUL VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681, *et seq.*

### (On behalf of Plaintiff and the Nationwide Class)

93.     Plaintiff incorporates paragraphs 1 through 73 as if fully set forth herein, but alleges Count II in the alternative.

94.     In enacting the FCRA, Congress made several findings, including that consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit information and other consumer information. 15 U.S.C. § 1681(a)(4).

95.     At all relevant times, Equifax acted as a consumer reporting agency as defined by the FCRA. Under 15 U.S.C. §1681a(f), a "consumer reporting agency" includes any person which, for monetary fees or on a cooperative nonprofit basis, regularly engages, in whole or in part, in the practice of assembling or evaluating consumer credit information or other consumer information for the purpose

of furnishing "consumer reports" to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

96.     At all relevant times, Equifax had compiled and maintained a "consumer report" on Plaintiff and Class Members as defined by the FCRA. 15 U.S.C. § 1681a(d)(1). As defined in 15 U.S.C. § 1681a(d)(1), a "consumer report" is any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, which is used, expected to be used, or collected, in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for (i) credit or insurance to be used primarily for personal, family, or household purposes, (ii) employment purposes, or (iii) any other purpose authorized by 15 U.S.C. § 1681b."

97.     The FCRA's definition of consumer report includes, without limitation, a consumer reporting agency's numerical credit score for an individual – which serves as a numerical representation of the agency's interpretation of an individual's overall creditworthiness. *See* 15 U.S.C. § 1681a(d)(1).

98.     As individuals, Plaintiff and Class Members are consumers entitled to the protections of the FCRA. 15 U.S.C. § 1681a(c).

99.     As a consumer reporting agency, Defendants were (and continue to be) required to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard, protect and ensure the accuracy of the consumer credit information in its possession, custody and control, including Plaintiff's and Class Members' credit reports and credit scores. *See* 15 U.S.C. 1681(b).

100.   As a consumer reporting agency, Defendants' actions or inactions that allowed for the Glitch violate its duties and obligations as a consumer reporting agency under the FCRA.

101.   Defendants' actions or inactions that allowed for inaccurate credit entries and or credit scores to be included on consumer reports also violate its duties and obligations as a consumer reporting agency under the FCRA.

102.   As alleged herein, Defendants have engaged in a number of practices that, taken together, establish that Defendants willfully failed to use reasonable measures to provide for the maximum possible accuracy on consumer credit reports. Among other things, Defendants failed to:

  a.   Develop and disseminate comprehensive information integrity policies, including those related to information verification related to the consumer reports and credit scores of Plaintiff and Class Members;

  b.   Assess the risks of using code that could and would lead to inaccurate credit scores and/or consumer reports being sent to lenders;

  c.   Take appropriate action to correct existing vulnerabilities or threats to personal information in light of known risks, especially those that lead to the Glitch;

  d.   Adequately train its employees on FCRA compliance; and/or

  e.   Develop and maintain a monitoring system in place to ensure its systems complied with the FCRA

103.   The lack of such reasonable measures to provide for the maximum possible accuracy on consumer credit reports directly caused damages to Plaintiff and Class Members, as detailed herein.

104.   By its above-described wrongful actions, inaction and omissions, want of ordinary care, and the resulting harm to Plaintiff and Class Members, Defendants willfully and recklessly violated the FCRA, 15 U.S.C. § 1681, *et seq.* by failing follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

105.   Defendants have violated 15 U.S.C.A. § 1681e(b) because, due to the

Glitch, Defendants failed to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

106.   Defendants repeatedly created inaccurate consumer reports as a result of the Glitch, and Plaintiff and Class Members have suffered the harm as detailed herein.

107.   Despite lacking sufficient testing procedures regarding the accuracy of the consumer reports and credit scores that would have prevented the Glitch, Defendants relied on these procedures, which were unreasonable, and thus Defendants had no reason to believe that all of the information it included its consumer report accurately pertained to the consumer who is the subject of the user's request.

108.   As a direct and proximate result of Equifax's actions and failures to act described herein, Equifax offered, provided, and furnished Plaintiff's and Class Members' inaccurate consumer reports. In each instance, Equifax was in violation of, Section 1681e of the FCRA.

109.   Equifax's failure to use reasonable information verification procedures resulted in a yet unknown number of inaccuracies on Equifax consumer account holder's credit reports, in violation of § 1681e(b).

110.   Under Section 1681 of the FCRA, Equifax is liable to Plaintiff and Class Members for willfully and/or recklessly failing to comply with the requirements that a consumer reporting agency shall use reasonable measures to ensure the maximum possible accuracy of the information contained within Plaintiff's and Class Members' consumer reports. Equifax therefore is liable to Plaintiff and Class Members for their actual damages as a result of Equifax's failure to comply with the FCRA, statutory damages, punitive damages, as well as costs and reasonable attorneys' fees, in amounts to be proven at trial.

111.   Each instance in which Equifax failed to comply with the FCRA constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

112.   By its above-described wrongful actions, inaction and omissions, want of

ordinary care, and the resulting harm to Plaintiff and Class Members, Defendants willfully and recklessly violated the FCRA, 15 U.S.C. § 1681, *et seq.* by failing to identify, implement, maintain and monitor the proper data verification measures, policies, procedures, protocols, and software and hardware systems to ensure the maximum possible accuracy of Plaintiff's and Class Members' consumer reports.

113.   In addition, Defendants' failure to comply with the foregoing requirements was willful because Defendants knew or should have known, but recklessly disregarded, that its information verification measures were inadequate and unreasonable and additional steps were necessary to protect Plaintiff and Class Members from the Glitch.

114.   As a result of the conduct, action and inaction of Equifax, Plaintiff suffered damage by loss of credit, loss of ability to purchase and benefit from credit, a chilling effect on future applications for credit, and the mental and emotional pain, anguish, humiliation and embarrassment of credit denial.

115.   Plaintiff and Class Members also are entitled to recover any actual damages sustained by them as a result of the failure or statutory damages of not less than $100 and not more than $1,000, 15 U.S.C. § 1681n(a)(1)(A); punitive damages, 15 U.S.C. § 1681n(a)(2); and their attorneys' fees, litigation expenses, and costs, under 15 U.S.C. § 1681n(a)(3).

## **RELIEF REQUESTED**

116.   WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests that this Court:

    a.   Certify this action is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

    b.   Appoint Plaintiff to represent the Class;

    c.   Appoint undersigned counsel to represent the Class;

d.  Award actual damages, statutory damages, and punitive damages where available, to Plaintiff and the Class Members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

e.  Award nominal damages to Plaintiff and the Class Members against Defendants;

f.  Non-restitutionary disgorgement of all of Defendants' profits that were derived, in whole or in part, from Equifax's furnishment of inaccurate consumer reports;

g.  Ordering Defendants to disgorge revenues and profits wrongfully obtained;

h.  Award Plaintiff and the Class Members their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

i.  Grant Plaintiff and the Class Members such further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues in this action so triable of right.


Dated: August 7, 2022                    Respectfully submitted,


*/s/ Greg Bosseler*
**GREG BOSSELER**
GA Bar N. 742496
**MORGAN & MORGAN**
191 Peachtree Street NE, Suite 4200,
Atlanta, Georgia 30303
Telephone: (404) 496-7254
Facsimile: (404) 720-3835
GBosseler@forthepeople.com

**MORGAN & MORGAN COMPLEX LITIGATION GROUP**

JOHN A. YANCHUNIS
(*Pro Hac Vice application forthcoming*)
JEAN SUTTON MARTIN
(*Pro Hac Vice application forthcoming*)
PATRICK BARTHLE
(*Pro Hac Vice application forthcoming*)
HOPE V. WHALEN
(*Pro Hac Vice application forthcoming*)
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 559-4908
Facsimile: (813) 222-4795
jyanchunis@forthepeople.com
jeanmartin@forthepeople.com
pbarthle@forthepeople.com
hwhalen@forthepeople.com