**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**DIVISION OF ATLANTA**

| | |
|---|---|
| IN RE: EQUIFAX, FAIR CREDIT REPORTING ACT LITIGATION | No. 1:22-cv-3072-LMM-CCB<br><br>CONSOLIDATED COMPLAINT – CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## <u>NATURE OF THE CASE</u>

1.    During a three-week period in the spring of 2022, Equifax[1] provided inaccurate credit reports for millions of Americans applying for loans. Plaintiffs, who are among the hundreds of thousands of individuals affected, were denied financing altogether, forced to accept higher interest rates, or otherwise had their ability to access credit limited because Equifax furnished inaccurate credit reports to their prospective lenders. As a result, Plaintiffs and countless others like them were unable to obtain houses that could become homes, cars that they needed to get to work, and loans to fulfill their educational goals.

2.    Consumer reporting agencies like Equifax monitor, collect, and assess

---

[1] "Equifax" or "Defendants" refers collectively to Equifax, Inc. and Equifax Information Services, LLC.

credit, repayment, and other information on consumers. Using this information, the agencies produce a credit report which includes multiple measures related to credit worthiness for individual consumers like Plaintiffs. Equifax is a consumer reporting agency subject to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. ("FCRA"), and thus is required to adopt reasonable procedures to ensure the "maximum possible accuracy" of the consumer credit information it furnishes lenders, *id*. § 1681e.

3.     Equifax failed in that duty. As its executives recently admitted, Equifax misreported credit information on millions of consumers from March 17 to April 6, 2022. Equifax admitted that the inaccurate information included errors in credit scores of 25 points or more for approximately 300,000 consumers.

4.     In public statements the company blamed the widespread problem on a "technology coding issue." Equifax's statements attempt to obfuscate its own responsibility for the errors. Instead of investing the resources necessary to maintain reliable computer systems, Equifax relied on antiquated and error-prone "legacy" systems to report credit information on millions of consumers. Equifax compounded the risks of using antiquated systems by writing faulty computer code that it failed to adequately test before implementing. Equifax's lax controls and inaccurate consumer credit reporting harmed Plaintiffs and other Class members, for whom Equifax reported inaccurate credit information in the spring of 2022.

5.      Accurate credit reporting is a critical component of American life. Credit allows members of the American public to access necessities and advance their economic aspirations by providing individuals with the tools they need to achieve their financial goals. Americans rely on credit reporting agencies, like Equifax, to accurately report their credit information to lenders and to follow reasonable procedures to provide accurate and complete data to lenders.

6.      Even a minor discrepancy in a consumer's credit information can result in a loan being denied or a higher interest rate being applied that increases loan payment amounts and protracts repayment schedules. Equifax's errors happened at a particularly inopportune time for many Class members. Rising interest rates since Equifax's inaccurate credit reporting have now locked many consumers out of obtaining loans—loans that they would have been able to obtain when they first applied for them had Equifax not inaccurately reported their credit information.

7.      Many Class members were denied loans or are paying higher interest rates as a result of the inaccurate information Equifax furnished lenders. Many other Class members paid fees as a result of Equifax's error because it led them to request from Equifax more than one credit report within a year's time, and federal law permits a consumer to obtain only one such report for free within a 12-month period. Equifax is liable to every Class member for statutory damages because the FCRA

provides for $1,000 in damages for each individual instance of willful noncompliance. 15 U.S.C. § 1681n(a)(1)(A).

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under a federal statute: the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*; this dispute, therefore, presents a federal question. The Court has supplemental jurisdiction over Plaintiffs' state-law claim under 28 U.S.C. § 1367.

9.     This Court also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are more than 100 Class members nationwide; the aggregate amount in controversy exceeds $5 million exclusive of interest and costs; and because the majority of Plaintiffs and Class members are of diverse citizenship from Defendants.

10.     This Court has personal jurisdiction over Defendants because Defendants maintain their principal place of business in Georgia. Defendants have continuous and systematic contacts with Georgia such that they have sufficient minimum contacts here. Further, Defendants intentionally avail themselves of this jurisdiction by maintaining and conducting their corporate operations in Georgia.

11.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because

Defendants are headquartered and have their principal place of business in this District, intentionally and regularly conduct business in this District, and a substantial part of the events, omissions, and acts giving rise to Plaintiffs' claims herein occurred in this District.

## PARTIES

12.   Plaintiff Sarah Hunter is a citizen and resident of Leesburg, Georgia.

13.   Plaintiff Nathan Raymond is a citizen and resident of Idaho Falls, Idaho.

14.   Plaintiff Derrick Rogers is a citizen and resident of Crystal River, Florida.

15.   Plaintiff Jason Veneigh is a citizen and resident of Tucson, Arizona.

16.   Plaintiff Benjamin Baker is a citizen and resident of Dripping Springs, Texas.

17.   Plaintiff Luis Ney Contreras, Jr. is a citizen and resident of Richmond, Virginia.

18.   Plaintiff Maurice Moore is a citizen and resident of Middle River, Maryland.

19.   Defendant Equifax, Inc. is one of the three largest consumer credit reporting agencies in the country. Equifax, Inc. is domiciled in Georgia and has its

headquarters and principal place of business at 1550 Peachtree Street, NW, Atlanta, Georgia, 30309.[2] Equifax, Inc. employs 14,000 people worldwide.[3] Its revenue in 2021 was $4.9 billion.[4]

20.    Defendant Equifax Information Services, LLC is a wholly owned subsidiary of Defendant Equifax, Inc. Equifax Information Services, LLC is domiciled in Georgia and has its headquarters and principal place of business at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309.

## PLAINTIFF-SPECIFIC ALLEGATIONS

### Plaintiff Sarah Hunter

21.    Plaintiff Sarah Hunter is a citizen and resident of Leesburg, Georgia. Ms. Hunter is a single grandmother with sole custody of her four minor grandchildren. In March and April 2022, Ms. Hunter and her grandchildren lived in a dilapidated rental property. Portions of the roof had caved in and mold was spreading throughout the house. Ms. Hunter was desperate to find a safe and secure home for her family and was terrified that her grandchildren would be removed from her care unless she moved.

22.    Ms. Hunter could not afford to purchase a new home outright, so she

---

[2] Equifax, Inc., https://www.equifax.com/about-equifax/who-we-are/.
[3] *Id*.
[4] *Id*.

applied for multiple home loans in March and April 2022. Though she should have been eligible for the loans she sought, every one of Ms. Hunter's home loan applications was denied.

23.     While she was applying for home loans, a lending agent showed Ms. Hunter her credit scores. Ms. Hunter regularly monitored her credit and understood that her credit score was between 640 and 660. She was, therefore, shocked to discover that Equifax reported that her credit score was between 540 and 580. In contrast, Ms. Hunter's Experian and TransUnion scores were around 80 points higher than her Equifax score. Ms. Hunter now knows, through counsel, that Equifax processed her credit score through the legacy OMS server at the time it was reporting inaccurate information on consumer credit scores as a result of Equifax's faulty code.

24.     Had Equifax accurately reported Ms. Hunter's credit score to her prospective lenders, she would not have been denied a home loan based on the inaccurate score. Instead, she and her grandchildren had to stay in their dilapidated rental house until Ms. Hunter was finally able to secure a home loan in September 2022—after Equifax started to correctly report her credit score.

25.     Ms. Hunter suffered emotional and financial damage as a result of Equifax's inaccurate credit reporting.

26.    Because she was unable to secure a home loan in March 2022 due to Equifax's reporting error, Ms. Hunter and her grandchildren resided in substandard housing for an additional five months. During this time, Ms. Hunter's grandchildren developed allergies as a result of exposure to the mold. Throughout this time, Ms. Hunter was distraught that she could not provide adequate housing for her grandchildren and she feared that her grandchildren would be removed from her custody and separated from one another for an indeterminate amount of time. The anxiety and stress caused by Equifax's failure to accurately report her credit information took an emotional toll on Ms. Hunter.

27.    In addition, Ms. Hunter was forced to spend approximately 90 hours speaking with various lenders and credit monitoring services to try to correct Equifax's inaccurate credit reporting.

**Plaintiff Nathan Raymond**

28.    Plaintiff Nathan Raymond is a citizen and resident of Idaho Falls, Idaho.

29.    On or about March 25, 2022, Mr. Raymond applied for a car loan from Toyota Financial Services in order to purchase a 2011 GMC Sierra. He needed to purchase a new car because he had been driving a nearly 20-year-old car that was starting to give out on him.

30.    While Mr. Raymond was applying for the car loan, the dealership showed him his credit scores. Mr. Raymond regularly monitored his credit and understood that his credit score was around 600. He was, therefore, surprised to see that Equifax reported his score as 550. Mr. Raymond's Experian and TransUnion scores were around 50 points higher than his Equifax score. Mr. Raymond now knows, through counsel, that Equifax processed his credit score through the legacy OMS server at the time it was reporting inaccurate information on consumer credit scores as a result of Equifax's faulty code.

31.    Mr. Raymond suffered financial damage as a result of Equifax's inaccurate credit reporting. He had to finance his vehicle purchase at a 21% interest rate, a far higher rate than he would have had to pay if Equifax reported his credit accurately. This resulted in a higher monthly car payment than he could comfortably afford.

32.    Had Equifax accurately reported Mr. Raymond's credit score to prospective lenders, his interest rate and corresponding monthly car payment would not have been increased on account of the inaccurate score. Instead, after he purchased his car in March, he spent considerable time trying to refinance so that he could lower his monthly payment. He ended up having to make payments at the 21% interest rate until he could finally refinance to a rate of 9.9% in November 2022. He

now has a monthly car payment that is $67 lower than what it was when he first purchased the vehicle.

**Plaintiff Derrick Rogers**

33.     Plaintiff Derrick Rogers is a citizen and resident of Crystal River, Florida.

34.     On or about April 5, 2022, Mr. Rogers applied for a loan to purchase his first home, but his application was denied. According to the mortgage company, Mr. Rogers would have qualified for the loan if his Equifax credit score had been 640 or above. Mr. Rogers regularly monitors his credit and understood that his Equifax score was around 656. Instead, Equifax inaccurately reported that his credit score was only 621—around 35 points lower than it should have been. Mr. Rogers now knows, through counsel, that Equifax processed his credit score through the legacy OMS server at the time it was reporting inaccurate information on consumer credit scores as a result of Equifax's faulty code.

35.     Mr. Rogers suffered financial damage as a result of Equifax's inaccurate credit reporting. He was unable to secure a mortgage in April, and therefore was unable to purchase a new home then. He spent hours speaking with a potential lender trying to resolve the issue with his Equifax credit score to no avail. Since then, interest rates on mortgages in the US have significantly risen. As a result,

Mr. Rogers missed an opportunity to obtain an affordable interest rate due to Equifax's credit reporting error.

**Plaintiff Jason Veneigh**

36.     Plaintiff Jason Veneigh is a citizen and resident of Tucson, Arizona.

37.     In or around March 2022, Mr. Veneigh applied for an auto loan from Bill Luke Dealership in order to purchase a 2014 Cadillac SRX. He was looking to replace a car that had been totaled in an accident.

38.     Although Mr. Veneigh regularly monitored his credit, and understood his credit score was around 670, Equifax reported that his credit score was 570, which was around 100 points lower than his Experian and TransUnion scores. Mr. Veneigh now knows, through counsel, that Equifax processed his credit score through the legacy OMS server at the time it was reporting inaccurate information on consumer credit scores as a result of Equifax's faulty code.

39.     Mr. Veneigh suffered financial damage as a result of Equifax's inaccurate credit score reporting. Because of Equifax's inaccurate credit reporting, Mr. Veneigh had to finance his vehicle purchase at a rate of 11%—which was a higher interest rate than what he would have received, had his Equifax score been accurate. He was also required to have a co-signer on the loan.

40.     Because his interest rate was higher than it should have been due to

11

Equifax's reporting error, Mr. Veneigh was unable to make the monthly payments, and the vehicle was ultimately repossessed. The repossession has negatively impacted Mr. Veneigh's credit.

## Plaintiff Benjamin Baker

41.     Plaintiff Benjamin Baker is a citizen and resident of Dripping Springs, Texas.

42.     On or around March 6, 2022, Mr. Baker began the process of applying to refinance his mortgage in order to secure a lower monthly payment. Early in the application process, Mr. Baker's lender reviewed his credit scores and told him he should expect an interest rate of around 3.99%. However, when Mr. Baker finalized his application around April 19, 2022, he was offered a rate of 4.25%. Mr. Baker asked his lender why his rate had increased and learned that it was due to a drop in his credit score.

43.     Mr. Baker regularly monitored his credit and knew his credit score was around 760. He was therefore surprised to learn that Equifax reported his score as 715 – which was around 40 points lower than his Experian and TransUnion scores. Mr. Baker now knows, through counsel, that Equifax processed his credit score through the legacy OMS server at the time it was reporting inaccurate information on consumer credit scores as a result of Equifax's faulty code.

44.     Had Equifax accurately reported Mr. Baker's credit score to his lender, his interest rate would not have been increased over the 3.99% that he was expecting because of the inaccurate credit score.

45.     Mr. Baker has suffered financial damages as a result of Equifax's inaccurate credit reporting. Due to Equifax's error, Mr. Baker now must make higher payments each month on his mortgage. These higher monthly payments will continue for an indefinite period of time. Because interest rates in the US have significantly risen since he refinanced, it's uncertain when he'll be able to refinance to a rate that is close to what he should have received in April 2022.

**Plaintiff Luis Ney Contreras, Jr.**

46.     Plaintiff Luis Ney Contreras, Jr. is a citizen and resident of Richmond, Virginia.

47.     In or around March 2022, Mr. Contreras was looking to buy a car to replace one that had been totaled in an accident. He needed a new car to be able to go to work. He applied for car loans throughout the course of a week, but his loan applications kept getting denied.

48.     Mr. Contreras regularly monitored his credit, and he understood his credit score to be around 500. He was therefore surprised to see that Equifax reported his credit score as 330 – around 170 points lower than his Experian and TransUnion

scores. Mr. Contreras now knows, through counsel, that Equifax processed his credit score through the legacy OMS server at the time it was reporting inaccurate information on consumer credit scores as a result of Equifax's faulty code.

49.    After about a week of trying, Mr. Contreras was finally able to secure financing on a 2016 Chevy Malibu from VA Cars. But it came at a high price: his car loan has a 28% interest rate.

50.    Mr. Contreras suffered financial damages as a result of Equifax's inaccurate credit reporting. He now has to pay higher monthly payments for his car than he otherwise would have had Equifax correctly reported his score when he was applying for car loans after his previous car was totaled.

## Plaintiff Maurice Moore

51.    Plaintiff Maurice Moore is a citizen and resident of Middle River, Maryland.

52.    On or around March 19, 2022, Mr. Moore applied for an auto loan from Delaware Cadillac in order to purchase a 2017 Cadillac CT6.

53.    Mr. Moore regularly monitored his credit, and he understood his credit score was around 723. He was therefore surprised to learn that Equifax reported his score at that time to be 697, which was around 26 points lower than his Experian and TransUnion scores. Mr. Moore now knows that Equifax processed his credit

score through the legacy OMS server at the time it was reporting inaccurate information on consumer credit scores as a result of Equifax's faulty code.

54. Mr. Moore suffered financial damages as a result of Equifax's inaccurate credit reporting. Mr. Moore had to finance his vehicle purchase at a rate of 6.48%—which was higher than the rate he would have received had Equifax correctly reported his credit score.

55. Because his interest rate was high due to Equifax's reporting error, Mr. Moore spent time attempting to refinance his auto loan. He refinanced it twice, and he was ultimately able to secure a 2.74% interest rate in June 2022.

56. Plaintiffs and Class members suffered damages because Equifax reported inaccurate credit information about them to third parties. In many cases, these injuries were compounded because Equifax's misreporting led to Plaintiffs and Class members, among other things, being denied credit or being forced to pay higher interest rates. All of these injuries resulted from Equifax's willful and reckless failure to implement reasonable procedures to ensure the maximum possible accuracy of its consumer credit reporting information in violation of common law and the Fair Credit Reporting Act.

## FACTUAL ALLEGATIONS

A.    **Equifax Misreported Consumers' Credit Information.**

57.    Equifax is one of the country's three major credit reporting agencies. Equifax monitors, collects, and assesses a diverse array of information on consumers. Using this information, it publishes and sells credit reports and credit scores for individual consumers like Plaintiffs.

58.    Hundreds of millions of consumers, lenders, employers, and other businesses rely on Equifax to determine, for example, the creditworthiness of consumers applying for mortgages and other loans, to approve or deny rental applications, and to help make hiring decisions. As Equifax acknowledges, its "unique data and analytics change millions of lives across the world."[5] Unfortunately, in March and April 2022, Equifax changed many lives for the worse by inaccurately reporting credit information about them to potential lenders.

59.    Equifax reported credit scores that were sometimes off by 20 points or more, "enough to alter the interest rates consumers were offered or to result in their applications being rejected altogether."[6] In some cases, Equifax inaccurately

---

[5] Equifax Inc., https://www.equifax.com/about-equifax/who-we-are/.

[6] Andrew Ackerman and AnnaMaria Andriotis, *Equifax Sent Lenders Inaccurate Credit Scores on Millions of Consumers*, Wall St. J. (Aug. 2, 2022, 3:11PM), *available at* https://www.wsj.com/articles/equifax-sent-lenders-inaccurate-credit-

16

reported scores by as many as 130 points. Equifax acknowledged that approximately 300,000 consumers' credit scores were inaccurately reported by 25 points or more.

60.     Despite the importance of accuracy in consumer credit reporting, Equifax only began disclosing its errors to lenders and other businesses in May of 2022.[7] But even then, it downplayed the scope of the problem.

61.     In a May 27, 2022 statement to the National Mortgage Professional trade publication, Equifax stated it had discovered "a coding issue within a program slotted for replacement" that caused a system to inaccurately report credit information about individuals.[8] Equifax then quietly began notifying lenders—but not consumers—that data elements for the "number of inquiries within one month" or "age of oldest tradeline" were potentially incorrect.[9]

62.     In its May statement, Equifax reported that the error affected all mortgage lenders who received consumer scores from the legacy system during this three-week period and that approximately 12% of credit scores for mortgage

---

scores-on-millions-of-consumers-
11659467483?st=l13znb3fsy0ik1n&reflink=desktopwebshare_permalink.
[7] *Id.*
[8] Steve Goode, *Equifax Telling Lenders of Potential Errors in Credit Scores,*
NationalMortgageProfessional.com (May 27, 2022), *available at*
https://nationalmortgageprofessional.com/news/equifax-telling-lenders-potential-
errors-credit-scores.
[9] *Id.*

applications were affected.[10] Despite the obvious impact on consumers, Equifax decided to notify just the lenders, leaving consumers in the dark.

63.     Later, at an investor conference in June 2022, Equifax's CEO Mark Begor publicly acknowledged that the company experienced a "coding issue that was a mistake made by [its] technology team, in one of [its] legacy applications that resulted in some scores going out with incorrect data."[11]

64.     Finally on August 2, 2022, Equifax issued a broader press release admitting that it had identified a coding issue in its computer systems used to calculate certain elements, or attributes, of a credit score.[12]

65.     Equifax's broader disclosure appears to have been prompted by a *Wall Street Journal* article indicating the problem affected "multiple consumer loan products, not just mortgages."[13] According to the Journal, "Equifax sent erroneous scores on people applying for auto loans, mortgages and credit cards to banks and

---

[10] *Id.*

[11] *Equifax Statement on Recent Coding Issue*, Equifax.com (Aug. 2, 2022), *available at* https://www.equifax.com/newsroom/all-news/-/story/equifax-statement-on-recent-coding-issue/.

[12] *Id.*

[13] Andrew Ackerman and AnnaMaria Andriotis, *Equifax Sent Lenders Inaccurate Credit Scores on Millions of Consumers*, Wall St. J. (Aug. 2, 2022, 3:11PM), *available at* https://www.wsj.com/articles/equifax-sent-lenders-inaccurate-credit-scores-on-millions-of-consumers-11659467483?st=l13znb3fsy0ik1n&reflink=desktopwebshare_permalink.

nonbank lenders big and small."[14] The percent of incorrect scores that a lender received varied. One bank, for example, received incorrect scores for 18% of its loan applicants during the three-week period, while another lender received incorrect scores for about 10% of its applicants during the period. Lenders also received credit scores with varying degrees of inaccuracy, with many scores off by 25 points or more.[15]

66.    On August 4, 2022, three members of Congress—Sens. Elizabeth Warren and Mark Warner, and Rep. Raja Krishnamoorthi—sent Equifax a letter seeking more information about its widespread credit-reporting error. The letter refers to the allegation that the error affected loan qualifications and interest rates as "deeply troubling," stating that borrowers "may be stuck paying higher costs for loans, credit cards, cars, and houses. Your company owes the public a clear and transparent explanation for why and how it made such grievous errors, the scope of the errors, and why you have failed to notify affected consumers of these errors."[16]

67.    Representative Maxine Waters implored the Consumer Financial

---

[14] *Id.*

[15] *Id.*

[16] Senator Elizabeth Warren, Senator Mark R. Warner, and Representative Raja Krishnamoorthi, *Letter to Equifax re Inaccurate Credit Scores*, (Aug. 4, 2022) *accessible at* https://www.warren.senate.gov/newsroom/press-releases/warren-warner-krishnamoorthi-blast-equifax-demand-answers-for-deeply-troubling-allegations-of-incorrect-credit-score-reports-that-harmed-consumers.

Protection Bureau (CFPB) to "impose a moratorium on Equifax providing any credit scores to financial institutions" until it can prove its controls are sufficient to ensure the accuracy of each credit score it provides.[17] In her letter to the CFPB, Congresswoman Waters also criticized Equifax for its "latest egregious abuse of consumers" and stated that "its leadership's team's efforts to downplay the harm is yet another example of harm caused by what is quickly becoming a recidivist bad actor."

68.    Congresswoman Waters also wrote directly to Mr. Begor on August 9, 2022, expressing "alarm[]" about the credit-reporting error and stating that she is "very concerned that this error likely resulted in economic injury and otherwise harmed consumers who may have been denied credit when they needed it or are now paying higher interest rates on loans than they are entitled to based on their actual credit scores when they applied." Congresswoman Waters further stated that, "[b]ased on your initial actions in response to this matter, I am deeply concerned not all harmed consumers will be promptly identified, notified, and made whole."

69.    In response to Congresswoman Waters's letter, Mr. Begor said that

---

[17] *Chairwoman Waters Vows to Hold Equifax Accountable for Repeatedly Harming Consumers*, U.S. House Comm. on Fin. Servs., (Aug. 10, 2022) *accessible at* https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=409755.

Equifax "takes this issue very seriously."

70.    Equifax now claims that it has fixed the problem, though consumers have no way to verify this or even discover whether their scores were affected in the first place. Given Equifax's delay in disclosing its failure to consumers and pattern of minimizing its failings, consumers are justifiably skeptical that Equifax has disclosed the full scope of its error or sufficiently implemented measures to prevent that error from recurring.

**B.    Equifax Is Required to Ensure Accuracy in Consumer Reports Under the FCRA.**

71.    As a consumer reporting agency, Equifax is subject to statutory and regulatory requirements under the FCRA. 15 U.S.C. § 1681a(f).

72.    Equifax generates and sells consumer reports or "credit reports" containing consumer information and details of a consumer's credit history to lenders and other businesses. The FCRA defines consumer reports as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility" for loans. 15 U.S.C. § 1681a(d)(1).

73.    Consumer reports are used to determine whether and on what terms a consumer will be offered credit, including, for example, mortgages, credit cards, student, car, and small business loans, as well as rental housing and insurance.

74.    Federal law further acknowledges: "The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. § 1681 (a)(1). Further, "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(3). Accordingly, the FCRA requires credit reporting agencies to adopt reasonable procedures to ensure the "maximum possible accuracy" of the consumer credit information and credit reports it furnishes to lenders. 15 U.S.C. § 1681e.

75.    According to the Consumer Financial Protection Bureau, "[a]ccuracy in consumer reports is of vital importance to the consumer reporting system, particularly as consumer reports play an increasingly important role in the lives of American consumers." Fair Credit Reporting, 86 Fed. Reg. 62468 (Nov. 10, 2021).

76.    Equifax is subject to the FCRA and may perform credit reporting services only if it adheres to the requirements of the FCRA and other laws meant to

ensure the accuracy of consumer credit information.

77.     Equifax's creation and furnishing of credit reports was intended to affect Plaintiffs and the other Class members. The harm to Plaintiffs and the other Class members from the inaccuracies in their credit reports that Equifax provided to prospective lenders was foreseeable to Equifax.

## C.     Equifax Acted Willfully in its Failure to Provide Maximum Possible Accuracy.

78.     Equifax blames its provision of inaccurate credit information on a "coding issue within a legacy, on-premises server environment [that was] slated to be migrated to the new Equifax Cloud infrastructure."[18]

79.     A legacy system is an outdated computer system or application based on obsolete technology or equipment. "It is generally a pejorative term, and when used suggests that the system needs to be replaced."[19] In other words, Equifax provided inaccurate credit information by relying on an obsolete computer system and then compounded the risks by implementing faulty computer code.

80.     Equifax admitted that it intended to replace its risky legacy system and

---

[18] Equifax Statement on Recent Coding Issue, https://www.equifax.com/newsroom/all-news/-/story/equifax-statement-on-recent-coding-issue/.
[19] Market Business News, https://marketbusinessnews.com/financial-glossary/legacy-system-definition-meaning/.

replace it with a new cloud environment that would "provide additional controls and monitoring that will help to detect and prevent similar issues in the future."[20] But Equifax's statements underscore that it was running legacy systems that it acknowledges needed to be replaced.

81.    Equifax is well aware of the risks it takes and harms it can cause by continuing to use legacy systems. In fact, this Court has already ordered Equifax to address the problem. In the multi-district litigation stemming from the massive 2017 Equifax Data Breach, which was venued in this District, Judge Thrash entered a Consent Order requiring Equifax to remediate its legacy systems and develop a governance process to retire its systems when they become antiquated. *See In Re Equifax, Inc., Customer Data Security Breach Litig.*, No. 1:17-md-02800, Dkt. 958 § 14 (entered Jan. 13, 2020).

82.    As such, Equifax was well aware of the risks associated with relying on antiquated computer systems, yet it knowingly and intentionally failed to implement reasonable safeguards to ensure the maximum accuracy of consumer information required by law.

---

[20] Equifax Statement on Recent Coding Issue (Aug. 2, 2022), *accessible at* https://www.equifax.com/newsroom/all-news/-/story/equifax-statement-on-recent-coding-issue/.

### D.   Equifax's Actions Have Caused Plaintiffs and Class Members Harm.

83.     Every day, lenders, employers, and other businesses request hundreds of thousands of credit reports from credit reporting agencies, like Equifax, to assist them in making decisions that, as Equifax put it, "impact some of life's most pivotal moments."[21]

84.     According to the CFPB, "inaccurate information in consumer reports can have significant adverse impacts on consumers. These impacts are particularly concerning for prospective renters and job seekers struggling to recover from the impacts of the COVID–19 pandemic." Fair Credit Reporting, 86 Fed. Reg. 62468 (Nov. 10, 2021). The CFPB also observed that "[c]onsumers with inaccurate information in their consumer reports may, for example, be denied credit or housing they would have otherwise received or may be offered less attractive terms than they would have been offered if their information had been accurate." *Id*. As such, the "maximum possible accuracy" requirement "remains as important today as it was when the statute was enacted in 1970." *Id*. at 62469.

85.     As a result of Equifax's inaccurate reporting of their credit information, Plaintiffs and Class members have suffered myriad harms, including at least the

---

[21] "Who We Are," Equifax, *accessible at* https://www.equifax.com/about-equifax/who-we-are/.

following:

    a.    Violation of the protections conferred by the FCRA;

    b.    Loss of the right to rely on accurate credit reporting;

    c.    Emotional distress caused by Equifax's misreporting;

    d.    Impairment of their ability to borrow money and/or to obtain credit;

    e.    Higher interest rates or less favorable loan terms;

    f.    Loss of use of and access to financial accounts and/or credit;

    g.    Loss of employment opportunities;

    h.    Lowered credit scores resulting from credit inquiries following inaccurate reports being provided to lenders;

    i.    Fees and lost time expended to obtain credit reports in order to monitor their credit information as a result of Equifax's error;

    j.    Money and time expended to free up assets to compensate for the loss of credit resulting from inaccurate credit scores; and

    k.    Continuing risks to their financial health and creditworthiness, which remains subject to further harm as long as Equifax fails to undertake the legally required steps to ensure the maximum possible accuracy of their consumer reports.

86. Equifax is liable to every Class member for statutory damages under the FCRA, which provides for $1,000 in damages for each instance of willful noncompliance within the meaning of 15 U.S.C. § 1681n(a)(1)(A).

87. Equifax willfully failed to comply with the FCRA requirement to "implement reasonable procedures to assure maximum possible accuracy." 15 U.S.C. §§ 1681e(b), 1681n(a)(1)(A). Equifax knew of the risks associated with maintaining antiquated computer systems and using faulty code that had not been adequately tested. Despite that, Equifax continued to provide inaccurate credit information to third-party lenders when it knew or should have known of the inaccuracies. As such, Equifax created an unjustifiably high risk of harm to consumers that was known or should have been known.

## CLASS ACTION ALLEGATIONS

88. Plaintiffs seek certification of the following Class under Rules 23(a), (b)(1), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure:

> All individuals and entities in the United States about whom Equifax reported inaccurate items of information to a third party as a result of the coding error that Equifax claims caused inaccurate credit reporting between March 17, 2022, and April 6, 2022 (the "Class").

89. Excluded from the Class are Defendants, Defendants' subsidiaries and affiliates, their officers, directors and members of their immediate families, and any entity in which any Defendant has a controlling interest, the legal representatives,

heirs, successors or assigns of any such excluded party; all consumers who make a

timely election to be excluded; governmental entities; and all judges assigned to hear

any aspect of this litigation, their immediate family members, and chambers staff.

90.     Plaintiffs reserve the right to modify or amend the definition of the

Class and/or add Subclass(es) before the Court determines whether certification is

appropriate.

91.     The Class meets the criteria for certification under Rules 23(a), (b)(1),

(b)(2), (b)(3) and (c)(4).

92.     **Numerosity:** Class members are too numerous to feasibly be joined in

a single lawsuit given that the Class consists of likely millions of individuals whose

credit information was inaccurately reported by Equifax.

93.     The exact number and identities of the members of the proposed Class

are unknown at this time and are within the exclusive knowledge of Equifax and can

be ascertained through Equifax's computer systems. Equifax has the administrative

capacity through its computer systems and other records to identify all members of

the Class, and such information is not otherwise available to Plaintiffs and the Class.

94.     **Commonality and Predominance:** Common questions of fact and law

exist with respect to all Class members and predominate over any questions affecting

only individual members. The common questions include, for example (and without

28

limitation):

    a.    Whether Equifax willfully failed to use reasonable procedures to ensure the information included in its consumer credit reports was accurate;

    b.    Whether Equifax used reasonable procedures to ensure the accuracy of Class members' credit reports;

    c.    Whether Equifax's conduct violates the FCRA;

    d.    Whether Equifax acted willfully or negligently by allowing the continuous inaccurate reporting of credit information without a remedy;

    e.    Whether Plaintiffs and the Class have sustained harm by consequence of Equifax's conduct and, if so, the appropriate measure of damages or equitable relief; and

    f.    Whether Plaintiffs and the Class are entitled to attorney's fees and costs.

95.    **Typicality:** Plaintiffs' claims are typical of the claims of other Class members, as all members of the Class were uniformly affected by Equifax's wrongful conduct in violation of law as complained of herein.

96.    **Adequacy:** Plaintiffs will fairly and adequately represent the Class's

interests. Plaintiffs have no conflicts with any other member of the Class. Plaintiffs have retained counsel who are competent and have experience in prosecuting complex class-actions, consumer-protection lawsuits, and privacy litigation.

97.    **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Equifax, so it would be impracticable for Class members to individually seek redress for Equifax's wrongful conduct. Even if all Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class-action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

98.    Equifax acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class

members that would establish incompatible standards of conduct for Equifax. Such individual actions would create a risk of adjudications which would be dispositive of the interests of other Class members and impair their interests. Equifax has acted and/or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief or corresponding declaratory relief appropriate.

## FIRST CLAIM
### Willful Violations of the Fair Credit Reporting Act
### 15 U.S.C. § 1681 *et seq.*

99.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

100.   Plaintiffs bring this cause of action on their own behalf and on behalf of the Class.

101.   Plaintiffs and Class members are consumers entitled to the protections of the FCRA. 15 U.S.C. § 1681a(c).

102.   Under the FCRA, a "consumer reporting agency" includes any person which, for monetary fees or on a cooperative nonprofit basis, regularly engages, in whole or in part, in the practice of assembling or evaluating consumer credit information or other consumer information for the purpose of furnishing "consumer reports" to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. At all relevant times,

Equifax was a consumer reporting agency. 15 U.S.C. § 1681a(f).

103.   Under the FCRA, a "consumer report" is any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, which is used, expected to be used, or collected, in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for (i) credit or insurance to be used primarily for personal, family, or household purposes, (ii) employment purposes, or (iii) any other purpose authorized by 15 U.S.C. § 1681b. At all relevant times, Equifax had compiled and maintained a "consumer report" on Plaintiffs and Class members. 15 U.S.C. § 1681a(d)(1).

104.   As a consumer reporting agency, Equifax was and is required to identify, implement, maintain, and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard, protect and ensure the accuracy of the consumer credit information in its possession, custody, and control, including Plaintiffs' and Class members' credit reports and credit scores. *See* 15 U.S.C. § 1681(b).

105.   The FCRA requires credit reporting agencies to adopt reasonable procedures to ensure the "maximum possible accuracy" of the consumer credit

information it furnishes lenders. 15 U.S.C. § 1681e. As discussed in depth above, Equifax failed to use reasonable measures to ensure the maximum possible accuracy of Plaintiffs' and Class members' credit information, by, among other reasons, failing to:

- Retire legacy systems and transfer their functions in a way that reduces risks to the integrity of the data that they hold;

- Implement monitoring systems to catch inaccuracies in credit information;

- Adequately test computer code before it is deployed in a production environment;

- Assess the risks of utilizing code that could – and did – result in inaccurate credit information being sent to third parties; and

- Promptly correct reporting errors as opposed to permitting inaccuracies to be continuously disseminated for three weeks.

106.   Equifax's actions or inactions were objectively unreasonable in ensuring the maximum possible accuracy of consumer reports.

107.   Equifax acted willfully and recklessly in violating the FCRA by failing to identify, adopt, maintain, and monitor reasonable procedures to assure the maximum possible accuracy of Plaintiffs' and Class members' consumer credit

information. 15 U.S.C. §§ 1681e(b), 1681n(a)(1)(A).

108.   Equifax recklessly disregarded that its information verification measures were inadequate and unreasonable and that additional steps were necessary to assure the accuracy of its credit reports on Plaintiffs and the other Class members. Equifax's actions and inaction entailed an unjustifiably high risk of harm that was either known or so obvious that it should have been known.

109.   As a direct and proximate result of Equifax's actions and inaction described herein, Equifax sold or otherwise furnished to third parties inaccurate consumer reports on Plaintiff and the other Class members. For each such instance, Equifax willfully violated the FCRA. But for Equifax's willful failure to adopt reasonable procedures to ensure the accuracy of Plaintiffs' and Class members' consumer credit information, they would not have sustained harm.

110.   As such, under 15 U.S.C. § 1681n(a), Plaintiffs and Class members are entitled to actual, statutory, and punitive damages in an amount to be determined at trial, as well as the costs of the action together with reasonable attorneys' fees as determined by the Court.

**SECOND CLAIM**
**Negligent Violations of the Fair Credit Reporting Act**
**15 U.S.C. § 1681 *et seq.***

111.   Plaintiffs re-allege and incorporate the preceding paragraphs as if fully

set forth herein.

112.   Plaintiffs bring this cause of action on their own behalf and on behalf of the Class.

113.   As previously discussed, the FCRA requires credit reporting agencies to adopt reasonable procedures to ensure the "maximum possible accuracy" of the consumer credit information they furnish to lenders. *See* 15 U.S.C. § 1681e.

114.   As a result of its wrongful actions, inaction, and want of ordinary care, Equifax breached its duty by failing to adopt—let alone maintain and monitor—reasonable procedures to ensure the maximum possible accuracy of Plaintiffs' and Class members' credit information. Specifically, Equifax failed to retire its legacy systems despite knowing that this failure would pose risks to Plaintiffs and Class members, implemented faulty computer code, and failed to adequately test that code before using it in a way that would affect Plaintiffs' and Class members' credit information. Equifax allowed credit reporting errors to persist for at least three weeks.

115.   As a direct and proximate result of its negligence, Equifax reported to third-party lenders inaccurate credit information about Plaintiffs and Class members. Equifax's inaccurate reporting resulted in harm to Plaintiffs and Class members, including, without limitation, worse loan terms and loan denials. But for Equifax's

negligent failure to adopt reasonable procedures to ensure the accuracy of Plaintiffs' and Class members' credit information, Plaintiffs and Class members would not have sustained harm.

116.   As the above allegations show, Equifax could and should have reasonably foreseen the harms that resulted from its actions and inaction.

117.   Accordingly, under 15 U.S.C. § 1681o(a), Plaintiffs and Class members are entitled to actual damages in an amount to be determined at trial, as well as the costs of the action together with reasonable attorney's fees as determined by the Court.

## THIRD CLAIM
### Negligence

118.   Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

119.    Plaintiffs assert this claim on behalf of themselves and the Class.

120.   Equifax owed a duty to Plaintiffs and Class members to use reasonable care in adopting procedures to ensure the maximum possible accuracy of the consumer credit information it furnishes lenders. This duty included, among other things: (a) retiring legacy systems and transferring their functions in a manner that reduces risks to the integrity of the data that they hold; (b) implementing monitoring systems to catch inaccuracies in credit information; (c) adequately testing computer

code before it is deployed in a production environment; and (d) promptly correcting reporting errors.

121.   Equifax had a common law duty to act reasonably to prevent foreseeable harm to those whose consumer information it maintained and disseminated. This duty existed because Plaintiffs and Class members were the foreseeable victims of Equifax's failure to adopt and maintain reasonable procedures to ensure the maximum possible accuracy of consumer credit information. Not only was it foreseeable that Plaintiffs and Class members would be harmed by Equifax's failure to retire its legacy systems, implement monitoring systems to catch inaccuracies in credit information, and adequately test computer code that would affect the accuracy of credit information, Equifax knew it was more likely than not that Plaintiffs and Class members would be harmed by this conduct.

122.   Equifax's duty also arose from its unique position as one of the three major nationwide credit-reporting agencies that create and sell consumer reports. These reports are used to determine whether a consumer will receive a loan and if so, on what terms. The consumer public and potential lenders, therefore, place a trust and confidence in Equifax to take reasonable measures to ensure that the credit information it furnishes is accurate. Equifax was therefore in a unique position to protect Plaintiffs and Class members against the harm that resulted from its violation

of its duty of care.

123.   Equifax's duty also is based on the FCRA, which reflects Congress's judgment that credit reporting agencies such as Equifax hold a unique and superior position in our economy, a position that if abused would foreseeably and probably injure consumers like Plaintiffs and Class members. The FCRA therefore requires that Equifax adopt reasonable procedures to ensure the "maximum possible accuracy" of the consumer credit information it furnishes lenders. 15 U.S.C. § 1681e. Equifax breached the duties it owed to Plaintiffs and Class members by failing to adopt, maintain, and monitor reasonable procedures to ensure the maximum possible accuracy of Plaintiffs' and Class members' credit information.

124.   As a direct and proximate result of its negligence, Equifax reported to third-party potential creditors and other businesses inaccurate credit information on Plaintiffs and Class members. Equifax's reporting of inaccurate information resulted in harm to Plaintiffs and Class members, including denials of loans or worse terms on loans. But for Equifax's negligent failure to adopt reasonable procedures to ensure the accuracy of Plaintiffs' and Class members' credit information, Plaintiffs and Class members would not have sustained harm.

125.   As a direct and proximate result of Equifax's negligence, Plaintiffs and Class members have been injured as described herein and are entitled to damages in

an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court enter an order:

A.    Certifying this action as a class action under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs and their attorneys to represent the Class;

B.    Awarding statutory, compensatory, and punitive damages against Equifax, including interest as permitted by law;

C.    Providing injunctive relief, including requiring Equifax to (i) implement new protocols, procedures, and practices that will ensure no further harm to consumers, (ii) disgorge Equifax's gross revenues and profits derived from its furnishment of inaccurate consumer reports, and (iii) inform each affected consumer that their information was misreported, what information about them was misreported, and to what entities it was misreported;

D.    Awarding reasonable attorney's fees and costs of litigation as provided by statute; and,

E.    Entering such further relief that the Court deems necessary or proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury of all claims and issues so triable.

DATED: December 16, 2022

<div style="margin-left:40%">

*/s/ Michael A. Caplan*
Michael A. Caplan
Georgia Bar No. 601039
T. Brandon Waddell
Georgia Bar No. 252639
Ashley C. Brown
Georgia Bar No. 287373
Katie W. Gamsey
Georgia Bar No. 817096
**CAPLAN COBB LLC**
75 Fourteenth Street NE, Suite 2700
Atlanta, Georgia 30309
Tel: (404) 596-5600
Fax: (404) 596-5604
mcaplan@caplancobb.com
bwaddell@caplancobb.com
abrown@caplancobb.com
kgamsey@caplancobb.com

*Liaison Counsel*

David M. Berger (admitted *pro hac vice)*
Eric H. Gibbs
(*pro hac vice application forthcoming*)
Rosemary M. Rivas
(*pro hac vice application forthcoming*)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Tel: (510) 350-9713
dmb@classlawgroup.com
ehg@classlawgroup.com

</div>

rmr@classlawgroup.com

Amy E. Keller (admitted *pro hac vice*)
**DICELLO LEVITT LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
akeller@dicellolevitt.com

Dena C. Sharp (admitted *pro hac vice*)
Simon S. Grille (admitted *pro hac vice*)
Mikaela Bock (admitted *pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
dsharp@girardsharp.com
sgrille@girardsharp.com
mbock@girardsharp.com

*Interim Class Counsel*